## CITY OF BEMIDJI AND ANOTHER v. WILLIAM S. ERVIN AND OTHERS.
## INTERSTATE POWER COMPANY AND ANOTHER, RESPONDENTS.[1]

December 9, 1938.

No. 31,845.

[1]Reported in 282 N. W. 683.

C. L. *Pegelow,* City Attorney, for appellant City of Bemidji.

*Junell, Fletcher, Dorsey, Barker & Colman* and *Hugh H. Barber,* for appellant Power Service Corporation.

*George L. Bargen,* for respondent Sam Myerson.

*Thayer C. Bailey* and *Joseph R. Harmon,* for respondent Interstate Power Company.

HOLT, JUSTICE.

Plaintiffs appeal from a judgment rendered against them in an action for a declaratory judgment.

The basis for the action is in short this: Bemidji is a city governed by a home rule charter. The defendant Interstate Power Company has had a franchise under which it furnished the city and its inhabitants electric energy for light, heat, and power over a distribution system constructed and owned by the company under a franchise from the city which expired June 21, 1936. In March, 1937, the city council decided to take steps to acquire a municipally owned plant for the manufacture and distribution of electricity. It employed electrical engineers to make the necessary plans and specifications for such a plant. This was done. The charter provides that work of this sort can only be let on competitive bids. The plans and specifications and the proposed contract therefor are to be on file in the city clerk's office when the call for bids is advertised. There were two calls for bids, one for the construction of the entire plant, including a distribution system; this contemplated that the bidder should accept, in payment of the purchase price, revenue certificates or bonds payable from the net earnings of the plant during the life of the franchise, and in no event from taxation or the general funds of the city; and the other was for bids to

furnish current to be distributed by the distribution system already in (this to be acquired if the successful bidder was other than the Interstate Power Company, the owner). Of course a 15-year franchise was to be granted to the one whose bid was accepted, and the bidders on either proposition had to specify the different rates to be charged for the current.

The call for bids duly published brought only two bids: One from the Power Service Corporation, on the first proposition, to construct the entire plant to be paid for by certificates and to receive the rates designated in the bid; and one from the Interstate Power Company to furnish the current at designated prices over its distribution system already there. The city council by resolution November 27, 1937, accepted the Power Service Corporation bid of $650,000, therein undertaking to construe the bid by striking out four paragraphs thereof and substituting others in place. This resolution was duly published and accepted by the bidder. Thereupon the city council passed ordinance 234, embodying the franchise and the terms of the contract and bid. It was approved by the mayor and duly published. Both the contract and ordinance must be ratified or approved by the voters of the city at an election to be duly called and held before they take effect. Before this last step was taken a controversy arose as to the validity of the proposed contract and ordinance, and in order to avoid the large expense of an election if these instruments were invalid, plaintiffs, the city and the Power Service Corporation, brought this action to have an adjudication of the validity of the same. The attorney general appeared, disclaiming interest in the suit, and was dismissed. The Interstate Power Company answered, alleging invalidity of the proceedings in many respects; so did defendant Goodman, a taxpayer and inhabitant of the city, and also intervener, another taxpayer and inhabitant. Each defendant further averred that the facts alleged in the petition or complaint did not warrant the court in pronouncing a declaratory judgment. The trial court determined that a declaratory judgment was proper to avoid the expense of an election in case it was found that the contract and ordinance were void, and made findings, upon the facts

stipulated, and conclusions of law adjudging the contract and ordinance void and enjoining performance thereof and the holding of the election, as was prayed in the answers, if the court took jurisdiction. Judgment was accordingly entered.

There are 26 assignments of error, but all are directed at the conclusions of law. Appellants agree with the trial court "that if the conclusions of law are correct as to issues it determined, treatment of the further issues can amount to nothing more than dicta and are not presently justiciable." In this we concur. As a rule it is inadvisable to consider or decide other questions than those determinative of the appeal. With this in mind it is not necessary to determine whether or not the facts pleaded by plaintiffs warranted the application for a declaratory judgment. The answers asserted the invalidity of the contract which the electors were to authorize or reject and ask that its performance be enjoined. While this relief was asked conditionally, yet, since it was granted, respondents are not harmed, for the judgment is in their favor. We therefore pass the question of the sufficiency of the complaint of plaintiffs for a declaratory judgment.

We think the assignments of errors 1, 2, and 3 are those alone upon which the decision must rest. They challenge this conclusion of law:

"That said ordinance [234] and the contract or proposed contract, hereinbefore mentioned, between said City and Power Service Corporation, are and will be illegal and void, whether or not the issuance of said certificates of indebtedness be approved by the voters at said election—all for the following reasons:" Then follow four reasons quite fully stated, which may be thus abbreviated:

(a) The contract could not be let unless §§ 6 to 14 of c. X of the city charter (pp. 82-84) were complied with, which required detailed plans and specifications and the proposed contract to be first filed with the city clerk, followed by an advertisement for bids for furnishing the commodities and service therein contemplated in accordance with the plans and specifications and proposed contract

so that the bids called for may be responsive thereto. The proposed contract was so indefinite as to preclude a competitive bid.

(b) Because the plans and specifications and proposed contract for the electric light, heat, and power plant and the advertisement for bids "did not contain or contemplate important and material provisions, beneficial to the bidder, of the proposal of said Power Service Corporation, as originally made or as construed and agreed upon, and of the conditional contract sought to be entered into by acceptance of said proposal and the passage of said ordinance, which material provisions require that revenue bonds be issued and the provisions of the indenture thereof be acceptable or satisfactory to said Power Service Corporation, and did not contemplate the provisions of said ordinance designed to secure and make more attractive the proposed certificates of indebtedness [bonds]; because neither said Power Service Corporation nor any other possible or prospective bidder was invited or given an opportunity to make a bid or proposal containing the important and material provisions so included in the accepted proposal and in said ordinance; because the contract for which bids and proposals were invited was too indefinite in its provisions in these respects to permit fair competition in the bidding; and because the bid and proposal of said Power Service Corporation, as made and as accepted, was not responsive to said advertisement for bids, but was a substantial departure therefrom and a new or counter-proposal, the attempted acceptance of which was not preceded by an advertisement for bids thereon."

The other two reasons, (c) and (d), need not be fully stated, for we deem the one above set out (b) condemns the contract and ordinance involved. The reason (c) was, in short, that no other possible bidder could base a bid upon such conditions as did the Power Service Corporation on the contract being made in time to enable it to complete its negotiations for the materials and service at no greater cost than its present commitments, and conditioned on the "nonconditional date" as defined in the clarifying resolution. The reason (d) is that the ordinance 234 by § 14 attempts to dele-

gate to the trustee or to a receiver appointed by the court powers to take over and manage the plant in certain contingencies, thereby removing the management and control thereof from the city.

The learned trial court so clearly elucidates the reason for the legal conclusion first above stated that we quote freely therefrom. After citing Nash v. City of St. Paul, 11 Minn. 110 (174) ; Diamond v. City of Mankato, 89 Minn. 48, 93 N. W. 911, 61 L. R. A. 448; Le Tourneau v. Hugo, 90 Minn. 420, 97 N. W. 115, it is stated:

"They [these decisions] apply the well-established doctrine that, when public bidding is required, the proposals and specifications must be so framed as to permit full and free competition, so that all bidders will have an opportunity to compete for a contract containing substantially the same terms and provisions, and that any substantial and material departure from the specifications, beneficial to the successful bidder, in the contract entered into will render same void, notwithstanding the fact that it appears there was only one bid."

It is perfectly obvious that the advertised proposed contract and proposal is quite a departure in material matters from the executed contract and ordinance 234. It is not contended that the plans and specifications, so far as adequacy and detail of the engineering work goes, were inadequate or indefinite. The indefiniteness is in the terms of the proposed contract filed with the city clerk and in the bid as to the terms of the bonds or revenue certificates to be accepted in payment for the plant.

In respect of the reason (b), the one we deem sufficient to void the contract and ordinance 234, the court says:

"Only in § 10 of the specifications is reference made to the manner in which the city proposes to pay for the plant, and this in the following language:

" 'The City intends to establish said plant and to finance it through the issuance of certificates or warrants payable solely from the net earnings of the plant as hereinafter defined and which shall not be a general obligation or payable out of taxes or any other funds of said City.'

"Then follows a definition of 'net earnings.'

"Neither in § 11 nor elsewhere in the specifications proper is there any invitation to bidders to amplify the provision quoted. The resolutions authorizing advertisement for bids, and the call made pursuant thereto, do contain this language:

" 'It is understood that any contract providing for the building of the electric plant and distribution system shall be accompanied by an agreement on the part of the contractor to accept in payment of said contract revenue warrants or certificates of said city and that said contractor shall include in his bid for said warrants a description of interest rate or rates, maturities, call prices, if any, and such other provisions as may be material to said bid; and further, that said contract amount is not payable out of taxes, or out of the general funds of the city, but solely out of revenue warrants or certificates aforesaid.'

"The proposal of Power Service Corporation, as made, after acknowledging the specifications, deals with this subject in the following language:

" 'Revenue bonds will be accepted by us at par value in the amount named in the above proposal, as payment for this contract. These bonds will be retired over a period of fifteen years, will have a coupon of 4¾%, and the indenture of these bonds will, in all respects, comply with the City Charter, State Laws, and the provisions of said indenture must be acceptable to us.'

"The resolution of the Council, adopted and approved after opening and considering the bid, construes and accepts it as though there were substituted for the language last above quoted the following language:

" 'We agree to accept at par, in full payment of the contract price, revenue bonds or revenue certificates of indebtedness legally issued by the city, to mature serially over a period of fifteen years, commencing at approximately the date said plant and system shall be placed in operation, to bear interest at the rate of 4¾% per annum semi-annually, and to be secured by a pledge of the net revenues of said plant and system as more fully specified in an indenture or

ordinance authorizing their issuance, which indenture or ordinance shall, among other things, provide that the net earnings of said plant and system, substantially as defined in paragraph 10 of the specifications shall be the sole source of payment, and which indenture or ordinance shall be made satisfactory to us as to details before the "non-conditional date" as hereinafter defined.'

"It is stipulated and found that the bidder accepted and agreed to this construction of its bid; and the Council thereupon adopted and the mayor approved the ordinance certain of whose provisions are proposed to be submitted to the voters for approval. The ordinance in very great detail incorporates and adds to the substance of the provisions I have already recited, very definitely directs how the operating revenues shall be safeguarded and applied, designates a Minneapolis bank as trustee to receive and handle the certificates of indebtedness, sets out comprehensively the language of the certificates, including covenants evidencing the rights of their holders, makes the certificates payable serially over a 15-year period, provides that in case of any default continuing over 60 days the trustee may declare all the certificates due and, among other things, apply to any court of competent jurisdiction for the appointment of a receiver, with such powers and duties as the court shall direct, to take control and management of the plant and system and their operations, with definite provisions contemplated to effectuate the purposes of the plant and secure the interests of all concerned.

"Presumably the Power Service Corporation was consulted as to the provisions of the ordinance in order that same should be made satisfactory to it.

"It seems perfectly obvious that here there was no opportunity for bidders to compete for a contract containing substantially the same terms and provisions, and that the proposal of Power Service Corporation, as accepted, departed very materially from what any other possible bidder could have expected to obtain. Perhaps the specifications and the proposed contract filed with them were sufficiently complete in themselves. No doubt certificates of indebtedness may be issued payable out of a special fund, and containing no more explicit language than in the city's original proposals. But if

the opportunity to each bidder to name his own maturities, interest rates, and call prices, be disregarded, the privilege to include in his bid 'such other provisions as may be material to said bid,' at least as interpreted by Power Service Corporation, left the way open for as many and as varied additional provisions as were conceivable in the minds of those desiring to compete. The successful bidder, indeed, by specifying only that the indenture of the bonds must be 'acceptable' or 'satisfactory' to it, reserved to itself until after the awarding of the contract the privilege of determining what the provisions should be; and that the most optimistic possible competing bidder would have anticipated the elaborate clauses of the ordinance is exceedingly improbable.

"I cannot look upon the procedure here followed as a compliance with the charter provisions requiring competitive bidding."

We concur in the conclusion so logically fortified by the trial court. The result is an affirmance of the judgment. The other objections to the validity of the executed contract and ordinance 234, so learnedly discussed in the court's memorandum, need not be considered. Nor is any useful purpose to be gained by a discussion of the many cited cases from other jurisdictions on points other than the one (b) which the court assigned as a reason for holding the contract and ordinance 234 void. The decision apparently stressed in the court below and here, Utah Power & Light Co. v. Provo City, 94 Utah, 203, 74 P. (2d) 1191, does not, as we think, touch the question we decide. It there appeared that the contract had been let for the construction of an electric energy plant to be paid for from revenue derived from the earnings of the plant, and that such contract embodied in an ordinance had been submitted to the voters under the initiative and referendum law of Utah and adopted by a narrow margin. It did not involve the point of the call for bids being so indefinite as to terms that the bid received thereon did not become definite but necessitated a clarification which imported into the contract material modifications of the initial proposal of the city to the advantage of the bidder.

The judgment is affirmed.